IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                     **REPORT,
RECOMMENDATION
AND ORDER**

v.

                                                     08-CR-170(S)(M)

JIMMY LEE BARNER,
                   Defendant.

_____

        This case was referred to me by Hon. William M. Skretny for supervision of all pretrial proceedings [29].[1] Before me is defendant's motion to suppress evidence [30] and the government's motion to compel defendant to provide a DNA sample [48]. An evidentiary hearing on defendant's motion to suppress evidence was held on November 26, 2008 and March 30, 2009,[2] at which Parole Officers Sean McPartland and LaSonya Spearman testified. The parties submitted post-hearing briefs on April 1 and 5, 2010 [61, 62].

        For the following reasons, I recommend that defendant's motion to suppress be granted, and I order that the government's motion to compel is denied, without prejudice to renewal in the event that my recommendation as to suppression is not adopted by Judge Skretny.

**BACKGROUND**

        On July 10, 2008, defendant was named in an indictment charging him with being a previously convicted felon in possession of firearms and ammunition, in violation of 18 U.S.C.

---

    [1]      Bracketed references are to the CM/ECF docket entries.

    [2]      The transcripts of the suppression hearing were not filed until January 27, 2010 [55, 56].

§§922(g)(1) and 924(a)(2), and seeking forfeiture of these items. Indictment [24]. One of the firearms at issue was seized on January 31, 2008, during a parole search, and was submitted to Erie County Central Police Services Forensic Laboratory, where it was swabbed for the presence of DNA. Tripi affidavit [48], ¶3.

On April 5, 2007, prior to his release from prison, defendant executed a "Certificate of Release to Parole Supervision", containing various "Conditions of Release". [56/83, 89; Gov't Ex. 1].[3] Directly above the conditions themselves, the document stated: "I understand that my violation of these conditions may result in the revocation of my release". Condition #4 stated: "I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property". Condition #8 prohibited defendant from threatening "the safety or well-being of myself or others", and Condition #9 prohibited him from possessing a firearm. Id. One of the Special Conditions of his release required him to "abide by a curfew established by the PO [parole officer]". Gov't Ex. 2.

Defendant was assigned to PO LaSonya Spearman [56/9]. She had received information that defendant possessed an illegal firearm which he had used to shoot at someone [56/10, 97]. On January 28, 2008, PO Spearman asked PO Sean McPartland to assist her in locating defendant. Id. The following day, Spearman, McPartland, and three other parole officers went to defendant's approved residence, namely the upper apartment of 109 Amherst Street, Buffalo, New York [56/10-11, 92-93, 99].

---

[3] References are to the docket number and page of the hearing transcript (*i.e.*, docket #56, p. 83).

PO Spearman had been to defendant's residence for parole visits on two prior occasions [56/93]. 109 Amherst Street contained two apartments that were unnumbered. The first floor apartment was occupied by defendant's mother, with a flight of stairs leading to a second floor apartment [56/67, 95]. Although it was after defendant's 9:00 p.m. curfew, he was not at his residence [56/12]. Therefore, on January 29, 2008, a parole warrant was issued based upon defendant's violation of parole [56/99; Def's Ex. B].

Defendant was taken into custody at approximately 11:45 a.m. on January 31, 2008, when he came to the parole office for a routine office visit [56/13-14, 102]. Defendant was handcuffed and placed in a holding room [56/54, 102]. His release ended at that time [55/17], and "he was no longer free to go back to the community" [55/12]. Although he was entitled to a hearing to determine whether his parole would be completely revoked [55/23], he has been in custody since that date [55/17].

Bureau Chief Donald Snyder directed POs McPartland and Spearman to attempt to obtain defendant's consent to search: "We were directed that if he consents and signs consent, to search the residence" [56/17-18]. POs Spearman, McPartland and Crowley advised defendant of the allegation against him, namely that he "days prior, fired a firearm at a victim" [55/50]. Defendant "maintained that he had no involvement in anything" [55/50], whereupon the officers stated: "We'd like to search your residence . . . . if there's nothing there, you have nothing to hide, then you have nothing to worry about"[56/44, 46]. They did not tell him that he had the right not to consent [56/ 53]. "He said okay" [55/50], and "signed a consent form verifying that he gave parole officers permission to search his residence". Government's post-hearing memorandum [61], p. 11. By "residence", they meant his apartment [56/34, 57, 58, 64]. There

was no discussion as to whether defendant controlled other portions of the building, including a storage room [55/34, 35].

The document which defendant executed at that time was entitled "Property Receipt". Gov't Ex. 3. The top half of the document stated: "The below listed items were removed from the person, residence or other locations as a result of a search conducted on 1/31/2008 at 109 Amherst St in the presence of Jimmy Barner . . . or in the presence of the person who granted permission to search." The bottom portion, listing the items seized, was blank when defendant signed the document, and was not filled out until after the search had been completed [56/19-20, 49-50].

After defendant signed the document, PO Spearman asked him for the keys, and he gave them to her [56/110]. "It was a key ring with three keys on it . . . . One key opened the outside downstairs door to the residence, one key opened the apartment door . . . . And the third key on the ring opened the door to a storage room which was adjacent to the door of [defendant's apartment approximately ten feet away" [56/23].

POs McPartland, Spearman and four other parole officers then escorted defendant to 109 Amherst Street [56/110]. Before bringing defendant into the apartment, they conducted a protective sweep of the apartment [56/23-24, 110], which revealed a small bag of a substance later determined to be crack cocaine in a bedroom [56/62, 111].[4] PO McPartland then looked across the hallway from the apartment and saw another door [56/63], which was approximately ten feet away from the door to defendant's apartment [56/25]. He "had no idea what was behind the door, what it was used for" [56/63]. He obtained defendant's keys from PO Spearman and

---

[4] Defendant does not seek suppression of the cocaine.

unlocked the door, without asking defendant whether he could search that area [56/64-5]. Defendant could not see him as he unlocked the door and entered the storage room [56/64, 69].

PO McPartland's search of the storage room revealed a shotgun and small revolver under the cushions of a couch, a .22 caliber rifle behind the couch, a box of ammunition [56/27], and mail addressed to defendant [56/26]. PO Spearman then advised defendant of his Miranda rights [56/28, 114]. Defendant "was aware of what had been found. He just sat there quietly and had really nothing to say" [56/28].

## ANALYSIS

A.  **Defendant's Motion to Suppress**

Defendant alleges that he had a reasonable expectation of privacy in the storage area across the hall from his apartment (defendant's affidavit [40, Ex. A]), and seeks to suppress the evidence seized following a search of that area. Defendant's memorandum of law [62], p. 29. The government argues that defendant consented to the search by executing the "Conditions of Release" (Gov't. Ex. 1), by orally consenting and executing the "Property Receipt" (Gov't. Ex. 3), and by failing to object to the search. *See* government's post-hearing memorandum [61], pp. 6-11.

"One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). However, "consent to search is not to be lightly inferred", United States v. Chisholm, 2009 WL 29313, *4 (E.D.N.Y. 2009), and its existence

"should be scrutinized with care" where, as here, the defendant is in custody. United States v. Vasquez-Santiago, 602 F.2d 1069, 1073 (2d Cir.1979), cert. denied, 447 U.S. 911 (1979).

"To ascertain whether consent is valid, courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." United States v. Garcia, 56 F.3d 418, 422 (2d Cir.1995). "The government has the burden of proving, by a preponderance of the evidence, that [the] consent to search was voluntary." United States v. Gandia, 424 F.3d 255, 265 (2d Cir. 2005).

With these standards in mind, I will analyze each form of consent argued by the government:

### 1. The "Conditions of Release"

The government argues that "the defendant was subject to search based on his conditions of release on parole. (See Gov't Ex. 1)." Government's post-hearing memorandum [61], p. 7. However, at the time of the search defendant's release to parole supervision had been revoked, subject to the possibility that he might "*resume . . . being supervised under parole*" following a hearing [55/46, emphasis added]. S*ee also* People ex rel. Watson v. Commissioner of New York City Department of Correction, 149 A.D.2d 120, 123, 544 N.Y.S.2d 585 (1st Dept. 1989) ("there [must be] a valid ground for taking the parolee back into custody. Thereafter, within 15 days, the agency is required to establish probable cause to believe that the parolee has violated one or more conditions of his release in an important respect at a preliminary hearing or to *restore* him to supervision (Executive Law §259-i [3] [c] [vi], [vii])"(emphasis added).

The "Conditions of Release" certainly suggest that they would apply only where defendant is not in physical custody. For example, Condition #1 states that "I will proceed directly to the area to which I have been released"; Condition #3 states that "I will not leave the State of New York . . . without permission"; and Condition #4 states that "I will permit my Parole Officer to visit me at my residence and/or place of employment". Moreover, the fact that the parole officers felt it necessary to obtain another consent from defendant strongly suggests that even they did not believe that the "Conditions of Release" were applicable at the time.

At the close of the hearing, I asked the parties in their post-hearing briefing to address "the effect, if any, of even a temporary revocation of release . . . on the conditions of release including consent to search" [55/75]. I repeated that directive in a Text Order [47]. The government, which bears the burden of proof on the issue of consent, has failed to directly respond to that inquiry.

For all of these reasons, I conclude that the government has failed to prove that the "Conditions of Release", including the consent to search, were operative at the time of the search.

2. **Defendant's Consent to the Search of His "Residence"**

"A consent search is limited to the scope of the consent given." United States v. Dotel, 1994 WL 25787, *2 (S.D.N.Y. 1994). Therefore, the search "may not exceed the scope of the authorization given." United States v. Coulombe, 2007 WL 4192005, *8 (N.D.N.Y. 2007).

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness - what would the typical reasonable person have

understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). The question is whether "under the circumstances, it [was] objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to conduct the search that was undertaken". Garcia, 56 F.3d at 423.

In determining the scope of consent given, "the exchange between the . . . officer and the individual from whom he seeks consent to search is critical". United States v. Richardson, 583 F.Supp.2d 694, 721 (W.D.Pa. 2008). Both PO McPartland and PO Spearman testified that they asked defendant only for consent to search his residence, *i.e.*, his apartment [56/34, 57, 58, 64]. In fact, at the time they requested defendant's consent, the officers did not even know of the existence of the storage area, which had never been discussed [56/35, 55/34-5]. PO McPartland admitted that he did not ask defendant for consent to search the storage area [56/64-5], which the government describes as being "*adjacent* to the defendant's apartment". Government's post-hearing memorandum [61], pp. 5, 6 (emphasis added).

Clearly, then, the government has failed to prove that the storage area and defendant's residence or apartment are one and the same. *See* Schettino v. Mann, 1989 WL 106859, *1 (E.D.N.Y. 1989) ("areas adjacent to the building . . . [are] not within the confines of the building itself").[5] *See also* government's post-hearing memorandum [61], p. 11 (referring to the search "of the defendant's residence *and* the storage area").

---

[5] At the conclusion of the hearing, I also directed the parties to parties to address in their post-hearing briefs the question of "whether a reference to a residence includes adjacent storage areas" [55/75], and repeated this directive in a Text Order [47]. The failure of the government (which bears the burden of proof on the issue of scope of consent) to submit any authority or argument on this issue is a further reason for granting the motion to suppress.

The fact that defendant gave PO Spearman (at her request) the key ring containing keys to the building, apartment and storage room does not itself signify his consent to a search of the storage room, since there is no indication in the record that the officers advised him at that time of their intention to search beyond the apartment.

Moreover, PO McPartland testified that defendant was told "if there's nothing there, you have nothing to hide, then you have nothing to worry about" [56/44, 46]. Defendant's knowledge that the firearms were located in the storage room makes it even more improbable that he believed that by consenting to a search of his apartment, he was also consenting to a search of the storage room. "A suspect may of course delimit as he chooses the scope of the search to which he consents . . . . This finding is supported by the theory that no sane man would consent to a search that was sure to turn up evidence he wanted concealed." United States v. Padilla, 986 F.Supp. 163, 169 (S.D.N.Y. 1997); United States v. Gregory, 204 F.Supp. 884, 885 (S.D.N.Y. 1962) ("the alleged consent under the facts and circumstances here presented - a defendant at once denying that narcotics are in his room and at the same time agreeing to a search which obviously must yield narcotics - is not in accord with common experience").

### 3. Defendant's Silence/Failure to Object to the Search

Finally, the government argues that "there is no evidence in the record that defendant ever objected to the search". Government's post-hearing memorandum [61], p. 11. However, "mere silence or the failure to object does not constitute consent unless the totality of circumstances so indicates." United States v. Taylor, 279 F.Supp.2d 242, 245 (S.D.N.Y. 2003).

Here, PO McPartland admitted that defendant could not see him as he entered the storage room. Once the contraband had been located, little point would be served by objecting. "Consent [must be] a product of [an] individual's free and unconstrained choice . . . rather than a mere acquiescence in a show of authority." Garcia, 56 F.3d at 422. This is particularly so where, as here, the defendant has not been advised of his right to refuse consent. "While informing an accused of the right to refuse consent is not essential to a voluntary consent, it is a factor." United States v. Rodriguez, 1989 WL 130081, *5 (N.D.N.Y.1989), aff'd, 916 F.2d 708 (2d Cir. 1990). Since the government has not met its burden of proving that defendant voluntarily consented to the search of the storage area, I recommend that the evidence seized from that area be suppressed.

**B.**     **Government's Motion to Compel**

The government seeks an order authorizing it to obtain DNA samples from the defendant by use of buccal swabs in order to "compare defendant's DNA to any DNA sample obtained from the firearm at issue". Tripi affidavit [48], ¶5. However, since I have recommended that the evidence (including the firearm and any DNA located thereon) obtained from the search of the storage area be suppressed, there is no reason at this time for the government to obtain a DNA sample from defendant.

Accordingly, the government's motion to compel is denied, without prejudice to renewal in the event that my recommendation as to suppression is not adopted by Judge Skretny.

## CONCLUSION

For these reasons, I recommend that defendant's motion to suppress the evidence seized from the storage room [30] be granted, and I order that the government's motion to compel [48] is denied, without prejudice to renewal in the event that my recommendation as to suppression is not adopted by Judge Skretny.

Unless otherwise ordered by Judge Skretny, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by May 24, 2010 (applying the time frames set forth in Fed. R. Crim. P. 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Skretny. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 58.2(a)(3) may result in the district judge's refusal to consider the objection.

**SO ORDERED.**

DATED:     May 5, 2010

                                                      /s/ Jeremiah J. McCarthy
                                                    JEREMIAH J. MCCARTHY
                                                    United States Magistrate Judge